**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| SUMMER HUNTER | CIVIL ACTION NO. 17-00616 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| UNITED STATES OF AMERICA | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court are two motions filed by Defendant, the United States of America ("Defendant"). The first motion is a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). See Record Document 31. The second motion is a Motion for Summary Judgment. See Record Document 30. Plaintiff Summer Hunter ("Hunter" or "Plaintiff") opposes both motions. See Record Documents 34 & 57. For the following reasons, Defendant's Motion to Dismiss is **GRANTED** and Defendant's Motion for Summary Judgment is also **GRANTED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

This matter arises out of the execution of an arrest warrant by the United States Marshal Service ("USMS") Fugitive Task Force ("Task Force"). On July 29, 2015, the Task Force sought to arrest Lawrence Blackburn ("Blackburn") who was wanted for first degree murder that left one person dead and another in "grave condition." Record Document 57-3 at 29; see also Record Document 1 at 2. After receiving information that Blackburn was visiting a relative in a Baton Rouge apartment complex, United States Marshal Brian Lucio ("Lucio") developed an operational plan. See Record Document 1 at 2. The plan included five United States Marshals—Brian Benton ("Benton"), Clayton McDonough ("McDonough"), Shawn Delaney ("Delaney"), John Barker ("Barker"), and David Grunewald ("Grunewald")—and 15 to 20 local law enforcement officers from the East

Baton Rouge Parish Sheriff's Office ("EBRSO") and the Baton Rouge Police Department ("BRPD"). See Record Document 31-1 at 2. Benton served as the team leader and was authorized to modify or change the operational plan as needed. See id. at 3; see also Record Document 57-3 at 80.

The plan was to send Delaney and Grunewald ahead of the others to establish a perimeter around the apartment complex to prevent Blackburn's escape. See Record Document 31-1 at 5; see also Record Document 57-3 at 34. The remaining law enforcement officers were to travel in a column formation with the EBRSO and BRPD leading and the Task Force members following behind. See Record Document 31-1 at 5. Upon arrival at the apartment complex, the local law enforcement officers were responsible for securing the area. See id. Once the perimeter was secure, the Task Force would attempt to contact Blackburn "through any means without breaching the apartment in order to get him to surrender." Id. at 6; see also Record Document 57-3 at 59. These attempts included contacting Blackburn via cell phone or using the public address system in the law enforcement vehicles. See Record Document 31-3 at 6. Ultimately, if contact could not be made without breaching the apartment, BRPD would enter the apartment with the Task Force securing the perimeter. See id.

The mission was going according to plan until the EBRSO and BRPD officers leading the column formation to the apartment complex made a wrong turn. See id. at 7; see also Record Document 57-4 at 46–47. With no radio communication between the Task Force vehicles and EBRSO and BRPD, the Task Force broke off from the column and drove to the apartment complex. See Record Document 31-1 at 7. At this point, Benton decided to deviate from the operational plan because the Task Force no longer

had the assistance of EBRSO and BRPD to secure the perimeter. See id. Furthermore, Benton was concerned Blackburn would escape if the Task Force did not immediately secure the designated apartment. See Record Document 57-4 at 49.

Upon arrival at the apartment complex, Benton and Barker went directly to the designated apartment located on the second floor—Apartment 6—positioning themselves side-by-side on the balcony, but short of the apartment's window. See Record Document 31-1 at 7; see also Record Document 57-5 at 26. Grunewald was on the opposite side of Apartment 6, facing Benton and Barker. See Record Document 30-2 at 3. Delaney moved from the perimeter to the first floor of the apartment building, eventually positioning himself directly below Apartment 6. See Record Document 30-2 at 2.

Once the Task Force was in position, Benton knocked on the apartment's window, announcing their presence and directing everyone out of the apartment. See id. at 3; see also Document 57-4 at 64. Erica Blackburn and her boyfriend quickly complied with Benton's commands and were taken to the side of the building with McDonough. See Record Document 30-2 at 3. Hunter and Blackburn remained in the apartment. See id. While in the apartment, Hunter glanced back at Blackburn "trying to put his shoe on with a gun." Record Document 30-11 at 2. After a few minutes, Hunter and Blackburn exited the apartment. See Record Document 30-11 at 5. Hunter was "screaming" and failed to obey the Task Force's commands. Record Document 57-4 at 67–68. Blackburn followed soon thereafter and stood directly behind Hunter. See id. at 68–69.

The remaining events are in dispute; however, both parties agree that Blackburn had a gun in his right hand that was pointed downward as he exited the apartment and stood directly behind Hunter. See Record Documents 30-1 & 57-1. Benton and Barker

both testify that they saw Blackburn raise his arm towards them and point a gun in their direction. See Record Document 57-5 at 29, 64; see also Record Document 57-4 at 69–70. Delaney testifies that he observed Hunter fall in the direction where Blackburn's gun was oriented. See Record Document 57-6 at 55. Benton testifies he then took cover while Barker fired his weapon. See Record Document 57-4 at 70. Delaney then attests that he had a clear shot of Blackburn once Hunter has fallen, and at that point Delaney fired his gun at Blackburn. See Record Document 57-6 at 57–58. The gunfire lasted only a "matter of seconds," during which Hunter was shot in the back of her right calf. Record Document 57-6 at 62; see also Record Document 1 at 3.

Hunter brought the instant suit under the Federal Torts Claim Act ("FTCA") alleging negligence against the USA. See Record Document 1. Hunter asserts two negligence claims: (1) negligence in changing the operational plan (hereinafter "pre-shooting negligence") and (2) negligent wounding by Barker. See id. Defendant filed a motion to dismiss the pre-shooting negligence claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. See Record Document 31. In addition, Defendant moved for summary judgment on the negligent wounding claim. See Record Document 30. Hunter filed an opposition to both motions. See Record Documents 34 & 57. Defendant filed replies. See Record Documents 44 & 40.

**LAW AND ANALYSIS**

I. **Motion to Dismiss**

   A. **Rule 12(b)(1) Standard**

Motions filed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure permit a party to challenge the subject matter jurisdiction of the district court to hear the case. Courts may dismiss a lawsuit for lack of subject matter jurisdiction on any one of

three different bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001). The party asserting jurisdiction bears the burden of proof for a Rule 12(b)(1) motion to dismiss. See id.

Rule 12(b)(1) challenges to subject matter jurisdiction come in two forms: "facial" attacks and "factual" attacks. Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981). A "facial" attack is limited to the pleadings and requires the trial court to assume the allegations as true. Id. A "factual" attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered. Id. Because the parties have submitted evidence outside the pleadings, Defendant's Motion to Dismiss is a "factual" attack, and the Court will consider the evidence in the record, resolving any disputed facts.

### B. Sovereign Immunity and the FTCA

Absent Congressional consent, sovereign immunity bars suits against the United States. See Block v. North Dakota ex. Rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819 (1983). The FTCA, however, waives sovereign immunity and "provides the sole basis of recovery for tort claims against the United States." Gonzales v. United States, 851 F.3d 538, 543 (5th Cir. 2017). The FTCA is subject to various exceptions, including the "discretionary function" exception at issue in this matter. 28 U.S.C. § 2680. The discretionary function exception applies to "[a]ny claim. . .based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or

not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception serves "to prevent judicial 'second-guessing' of legislative and administrative decisions…" United States v. Gaubert, 499 U.S. 315, 323, 111 S.Ct. 1267, 1273 (1991).

The United States Supreme Court formulated a two-part test to determine whether a governmental act falls within the discretionary function exception. See id. at 322–23. First, the court must determine whether the act involves an element of judgment or choice. See id. at 322. Under this prong, the court decides whether a statute, regulation, or policy mandates a specific course of action. See id. If no mandate exists, the governmental action is considered discretionary. Second, the court determines whether "that judgement is of the kind that the discretionary function was designed to shield." Id. at 322–323. Relative to this inquiry is "whether that judgment or choice is based on considerations of public policy." In re Katrina Canal Breaches Consol. Litig., 627 F. Supp. 2d 656, 669 (E.D. La. 2009).

### C. Analysis

Defendant asserts Benton's decision to change the operational plan and effectuate Blackburn's arrest without the assistance of local enforcement is protected by the discretionary function exception. See Record Document 31-1 at 13. More specifically, Defendant contends that USMS policy does not mandate the use of local law enforcement in effectuating arrests, but rather the policy affords significant discretion to the Task Force. See id. Furthermore, Defendant asserts the second-prong of the discretionary function exception is satisfied because the decision to change the operational plan "involved the very types of choices or judgments that the 'discretionary function was designed to shield.'" Id. at 15 (quoting Gaubert, 499 U.S. at 322–23, 111 S.Ct. at 1273.).

In her opposition, Plaintiff essentially concedes the discretionary function exception is satisfied.[1] See Record Document 34 at 1. Plaintiff instead focuses on a new conspiracy claim against Benton that was not raised in the complaint.[2] See id. Plaintiff asserts this conspiracy claim would survive the discretionary function exception. See id. at 1–2. In their reply, Defendant urges the Court to disregard Plaintiff's conspiracy claim as it has no "bearing on whether her negligence claim is jurisdictionally barred." Record Document 44 at 2. Furthermore, Defendant contends Plaintiff has failed to meet her burden of proving jurisdiction exists regarding her pre-shooting negligence claim, and as such, the Court must dismiss the claim pursuant to Rule 12(b)(1). See id.

The Court agrees with Defendant, the change in the Task Force's plan falls squarely within the discretionary function exception. Regarding the first prong of the discretionary function test, the Court finds there is no statute, regulation, or policy mandating the Task Force wait for local law enforcement assistance before effectuating an arrest. Defendant provided the Court with the USMS policy pertaining to effectuating an arrest, which reads:

> The deputy in charge of planning the arrest will consider whether circumstances dictate informing the local authorities in advance. When it can be anticipated that additional assistance will be required to carry out the arrest effectively and with maximum safety, the deputy-in-charge should solicit local police assistance

---

[1] "Assuming *arguendo*, that Benton can claim that his deviation of the plan was because of some discretionary function based on social, political, or economic policy…" Record Document 34 at 1.

[2] The Fifth Circuit has routinely held "[a] claim which is not raised in the complaint, but, rather is raised only in response to a motion for summary judgment is not properly before the court." Cutera v. Bd. of Supervisors of Louisiana State Univ., 429 F.3d 108, 113 (5th Cir. 2005). Additionally, Plaintiff has not sought leave of Court to amend her complaint. Therefore, this conspiracy claim is not properly before the Court. Furthermore, even assuming this claim was properly alleged in the complaint, the Court notes Plaintiff provides scant evidence to support this alleged conspiracy. See Record Document 34.

Record Document 31-11 at 2 (USMS Policy Directive § 8.9(B)(3)). Nowhere in the USMS policy does it mandate the use of local police assistance. Rather, the policy suggests the deputy planning the arrest "should solicit local police assistance." Id. Here, the deputy-in-charge of planning, Lucio, did solicit local police assistance, but ultimately Benton as team leader decided the priority of securing Blackburn outweighed the need to wait for local police assistance. See Record Document 57-4 at 48–49; see also Record Document 57-3 at 29–30. Because there is no statute, regulation, or policy mandating the use of local police assistance in effectuating an arrest, the first prong of the discretionary function test is satisfied.

Under the second prong, the Court finds the Task Force's decision to effectuate the arrest without the assistance of local police is grounded in public policy. See Small v. United States, No. 17-1497, 2018 WL 5020054, at *13 (W.D. La. Sept. 21, 2018) ("The enforcement of federal criminal statutes through the investigation and apprehension of suspected violators is generally viewed as being grounded in public policy."). Additionally, there was a strong public policy interest in apprehending Blackburn, who was wanted for first-degree murder, and taking him to court to answer that charge. See Hawkins v. Untied States, No. 93-193, 1994 WL 802850, at *2 (W.D. Tex. Nov. 29, 1994) (finding discretionary function exception satisfied where law enforcement agent was executing an arrest warrant for a violent felony). Furthermore, as it is the duty of law enforcement agents to enforce the law, the decisions on how best to fulfill that duty are generally protected by the discretionary function exception. See McElroy v. United States, 861 F. Supp. 585, 591 (W.D. Tex. 1994). Therefore, because the Task Force's decision is clearly

"based on considerations of public policy," the second prong of the discretionary function test is satisfied. In re Katrina Canal Breaches Consol. Litig., 627 F. Supp. 2d at 669.

Finally, even assuming the discretionary function test could not be satisfied, Plaintiff bears the burden of proving jurisdiction. Therefore, Plaintiff's failure to address the jurisdiction of the pre-shooting negligence claim in response to Defendant's Motion to Dismiss constitutes abandonment of the claim. See Black v. N. Panola Sch. Dist., 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned retaliatory abandonment claim when she failed to defend claim in response to motion to dismiss).

Defendant's Motion to Dismiss the pre-shooting negligence claim pursuant to Federal Rule of Civil Procedure 12(b)(1) is **GRANTED**.

## II. Motion for Summary Judgment

### A. Rule 56 Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). A genuine dispute of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. See Geoscan, Inc. of Texas v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004).

In reviewing a motion for summary judgment, the court must view "all facts and inferences in the light most favorable to the non-moving party." Rogers v. Bromac Title Servs., L.L.C., 755 F.3d 347, 350 (5th Cir. 2014). But the non-moving party "cannot defeat

summary judgment with conclusory allegations, unsubstantiated assertions, or only a 'scintilla of evidence.'" Hathaway v. Bazanay, 507 F.3d 312, 319 (5th Cir. 2007) (internal citations omitted). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

### B. FTCA and Negligence

The FTCA provides the exclusive remedy "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). Pursuant to the FTCA, the government's liability is determined by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the alleged negligence occurred in Louisiana, the government's liability will be determined pursuant to Louisiana law.

Louisiana has adopted a duty-risk analysis for negligence claims. See Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La. 11/30/94), 646 So. 2d 318, 321. To assert a claim for negligence, Plaintiff must prove: (1) defendant owed a duty of care to the plaintiff (duty element); (2) defendant failed to conform his conduct to the appropriate standard of care (breach of the duty element); (3) the defendant's conduct was a cause-in-fact of the plaintiff's injuries (cause-in-fact element); (4) defendant's conduct was a legal cause of the plaintiff's injuries (scope of the duty element); and (5) actual damages (damage element). See Pinsonneault v. Merchs. & Farmers Bank & Trust Co., 2001-2217, p. 6 (La. 4/3/02), 816 So. 2d 270, 275–76. All five elements must be met for plaintiff to recover for a defendant's negligence. See Mathieu, 646 So. 2d at 322.

### C. Analysis

Defendant asserts Plaintiff cannot prove that Barker breached his duty of care—a prerequisite to recovery under the duty/risk analysis.[3] See Record Document 30-2 at 8. More specifically, Defendant contends that Barker's conduct was within the "standard of reasonableness under the circumstances," the Louisiana standard for determining whether a law enforcement officer breached their duty. Id. (quoting Dyer v. City of New Orleans, 96-2802, p. 6 (La. App. 4th Cir. 8/20/97), 700 So. 2d 866, 869, *writ denied*, 97-2347 (La. 11/26/97), 703 So. 2d 650). Therefore, Defendant asserts because Plaintiff cannot prove a necessary element of negligence, summary judgment is warranted to dismiss the negligent wounding claims.

In her opposition, Plaintiff contends there are material facts preventing summary judgment. Namely, Plaintiff asserts "Barker and Benton claim that Blackburn raised his gun at them before Benton fired. Delaney refutes that claim. This is the material issue of fact that requires a trial." Record Document 57 at 13. In its reply, Defendant contends there is no evidentiary support that Delaney refuted Benton or Barker's testimony regarding the location of Blackburn's gun.[4] See Record Document 40 at 1. Further, Defendant reiterates that Barker's conduct was reasonable under the totality of circumstances. See id. at 5–9. The Court agrees with Defendant; Plaintiff has failed to prove Barker breached his duty of care.

---

[3] Based on the Complaint, it appears Plaintiff's claim of negligent wounding is solely against Barker. See Record Document 1. However, in its' Motion for Summary Judgment, Defendant focuses on the Task Force's conduct as a whole. See Record Document 30-2. For purposes of this ruling, the Court will follow the Complaint and focus the negligent wounding analysis on Barker.

[4] Defendant attached Delaney's videotaped interview immediately following the incident in question because it was referenced at length during Delaney's deposition. See Record Document 40 at 2. The Court has viewed the interview in consideration of this ruling. See Record Document 42.

It is not contested that Barker owed a duty of care to act reasonably under the totality of the circumstances. See Record Document 30-2 at 8; see also Record Document 57 at 11. The sole contested issue is whether Barker breached that duty of care. The Louisiana Supreme Court has held that breach of a law enforcement officer's duty in executing an arrest warrant should be determined through the application of the Kyle v. City of New Orleans factors. See Mathieu, 646 So. 2d at 323 (incorporating factors first enumerated in Kyle); see also Kyle, 353 So. 2d 969, 973 (La. 1977) (articulating the standard of conduct for police officers when making an arrest). Whether a defendant breached a duty of care is a question of fact. See Stroik v. Ponseti, 96-2897, p. 7 (La. 9/9/97); 699 So. 2d 1072, 1078.

The Kyle factors to determine whether the officers acted reasonably under the circumstances are: (1) the known character of the arrestee; (2) the risks and dangers faced by the officers; (3) the nature of the offense involved; (4) the chance of the arrestee's escape if the particular means are not employed; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officers compared to the arrestee; and (7) the exigency of the moment. See 353 So. 2d at 973.

The first Kyle factor is the known character of the arrestee. Here, the Task Force knew of Blackburn's history to be armed and dangerous with violent tendencies. See Record Document 30-5 (USM-129 Individual Custody/Detention Report). The second Kyle factor is the risk and danger faced by the officers. Blackburn refused to follow the Task Force's orders and exited the apartment armed with his gun in motion. See Record Document 57-5 at 27–29. Louisiana courts have consistently found the presence and attempted use of a weapon during an arrest constitutes significant risk and danger. See

It is not contested that Barker owed a duty of care to act reasonably under the totality of the circumstances. See Record Document 30-2 at 8; see also Record Document 57 at 11. The sole contested issue is whether Barker breached that duty of care. The Louisiana Supreme Court has held that breach of a law enforcement officer's duty in executing an arrest warrant should be determined through the application of the Kyle v. City of New Orleans factors. See Mathieu, 646 So. 2d at 323 (incorporating factors first enumerated in Kyle); see also Kyle, 353 So. 2d 969, 973 (La. 1977) (articulating the standard of conduct for police officers when making an arrest). Whether a defendant breached a duty of care is a question of fact. See Stroik v. Ponseti, 96-2897, p. 7 (La. 9/9/97); 699 So. 2d 1072, 1078.

The Kyle factors to determine whether the officers acted reasonably under the circumstances are: (1) the known character of the arrestee; (2) the risks and dangers faced by the officers; (3) the nature of the offense involved; (4) the chance of the arrestee's escape if the particular means are not employed; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officers compared to the arrestee; and (7) the exigency of the moment. See 353 So. 2d at 973.

The first Kyle factor is the known character of the arrestee. Here, the Task Force knew of Blackburn's history to be armed and dangerous with violent tendencies. See Record Document 30-5 (USM-129 Individual Custody/Detention Report). The second Kyle factor is the risk and danger faced by the officers. Blackburn refused to follow the Task Force's orders and exited the apartment armed with his gun in motion. See Record Document 57-5 at 27–29. Louisiana courts have consistently found the presence and attempted use of a weapon during an arrest constitutes significant risk and danger. See

Dawson v. Falgoust, 16-373, p. 6 (La. App. 5th Cir. 12/21/16), 215 So. 3d 373, 379, *writ denied*, 2017-0290 (La. 4/7/17), 218 So. 3d 111 (finding the officer's risk of danger was "imminent" where suspect lunged at mother's boyfriend with a knife); see also Stroik, 699 So. 2d at 1078 (knowledge of at least one armed perpetrator when approaching a vehicle was an "extreme and imminent" risk).

The third Kyle factor is the nature of the offense involved. In this case, the Task Force was attempting to arrest a suspect wanted for first degree murder that left one person dead and another in "grave condition." Record Document 57-3 at 29; see also Record Document 30-6. In their attempt to execute the arrest warrant, Blackburn exited the apartment with a weapon. Therefore, the nature of the offense transformed into serious and potentially life-threatening. See Record Documents 30-1 & 57-1

The fourth Kyle factor is the chance of the arrestee's escape if the particular means are not employed. Here, there is no evidence indicating Blackburn's chance of escape would increase if Barker did not fire his weapon. Rather, there is evidence indicating the opposite, the area around the apartment complex was surrounded by local law enforcement making it difficult for Blackburn to escape. See Record Document 31-8 at 15–16.

The fifth Kyle factor is the existence of alternative methods of arrest. As discussed above, Lucio developed two alternative plans that minimized Blackburn's contact with the Task Force. See Record Document 57-3 at 59. However, Benton as team leader of the operation, decided to change the plan because of the missed turn by local law enforcement. See Record Document 57-4 at 48–49. This decision was made in order to

prevent Blackburn's escape and was found by this Court to fall within the FTCA's discretionary function exception.

The mere availability of other methods of arrest does not automatically render Barker's conduct unreasonable. See Stroik, 699 So. 2d at 1079. Furthermore, "the scope of the officers' duty to act reasonably under the circumstances does not operate to restrict the officers to employing only the best of several available alternatives, or the least intrusive." Id. Once the Task Force was faced with an arrestee who was disobeying orders and was clearly armed with a gun in movement, Barker chose a reasonable course under the circumstances. See Record Document 57-5 at 27–29. Therefore, while alternatives did exist, there was nothing unreasonable about the alternative elected by Barker under the circumstances.

The sixth Kyle factor is the physical size, strength, and weaponry of the officers compared to the arrestee. Here, the evidence is clear that Blackburn was outnumbered by the members of the Task Force. See Record Document 30-2 at 11. The seventh and final Kyle factor is the exigency of the moment. This exchange of gunfire lasted only a matter of seconds. See Record Document 57-6 at 61–62. Barker had little time to react once he realized Blackburn was armed and raising his weapon. See Record Document 57-5 at 58. As the Louisiana Supreme Court found in Mathieu, an officer approaching suspects believed to be armed and dangerous must "make a quick decision under extremely charged circumstances." 646 So. 2d at 326. As there is no dispute that Blackburn was armed, the exigency of this moment was severe, and Barker had to make the best decision in that moment. See Record Documents 30-1 & 57-1.

Upon consideration of the Kyle factors and considering the totality of the circumstances, the Court finds Barker's actions to be reasonable. Barker made a split-second decision in the face of an armed and dangerous suspect to protect the safety of Plaintiff and the other members of the Task Force. See Record Document 57-5 at 58. Furthermore, the dispute over the exact direction of the Blackburn's gun is immaterial. As Defendant correctly notes, the Fifth Circuit has "never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." Salazar-Limon v. City of Houston, 826 F.3d 272, 279 n.6 (5th Cir. 2016).[5] Louisiana courts have also made clear that the presence of a weapon by a suspect must be treated as "serious and potentially life-threatening." Stroik, 699 So. 2d at 1078.

The Court finds the evidence is clear that Blackburn was in possession of a gun when he exited the apartment and that gun was in motion. See Record Document 57-5 at 64; see also Record Document 57-6 at 52–53. Out of fear for the life and safety of Plaintiff and the Task Force, Barker's use of force was reasonable under the totality of the circumstances. Therefore, Barker did not breach his duty of care.

Because Plaintiff failed to prove a genuine issue of fact as to an essential element of the negligence analysis, Plaintiff's claim for negligent wounding must be **DISMISSED**.

---

[5] Although this case was analyzed under the federal Fourth Amendment excessive force standard, the Fifth Circuit has found the Kyle reasonableness standard similar to the Fourth Amendment excessive force standard. See Deshotels v. Marshall, 454 F. App'x 262, 269 (5th Cir. 2011).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Record Document 31) is **GRANTED** and Defendant's Motion for Summary Judgment (Record Document 30) is also **GRANTED**. Therefore, all of Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith. The Clerk of Court is directed to close this case.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this the 12th day of December, 2019.

*[signature]*
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT